Good morning. Once again, I'm Richard Kaplan on behalf of claimant Alain Cyr, the appellant. First and foremost, this is not a drug case. This is a case about failure to report, bringing currency into the United States, and whether or not complete forfeiture is excessive. The only reason you get into drugs at all in this case is because the second part of a pretty good analysis, not one we're stuck with, but we can do other things, but we're suggested in $100,000 of $100,348 that we should consider four factors. And one of the four factors is, was the violation related to other illegal activities. That's the only reason you get into a drug case. And that's why we're here. That's where I say us and the government certainly disagree as to what the facts show. And I think just cutting right to the chase in that, the salient fact that they rely on that even would even get us to this argument of drugs is the DoD search. And I guess before you even get to that, what is the standard of review that I use in determining what the district court found here? District court found the currency was probably connected to drug trafficking. That is, to me, a factual determination. And so what standard of review should I use? Well, I think $100,348 says, if you find it, that it's clearly erroneous. So then I've got to find what the district court said about that is clearly erroneous. So I read what the district court said, and it said Sear was carrying a lot of cash. There was a drug dog who was trained to alert to cash that had recently been involved in drugs, and that drug dog alerted to that cash. Sear told two stories about the cash, and Sear was very nervous. Now, on those facts, I have to find clearly erroneous. That's not all they went to, but I threw out the three where I thought you had your best argument. I went to the four, which are dead on. Okay. Let me address the dog search first where I feel it was clearly erroneous. First of all, the cases that the government cited that you have to rely on the dog search is the sophistication of the dog search. It has to be a sophisticated dog search. And the distinction that's made in the cases that finds a sophisticated dog search, there's evidence presented how the dog can distinguish between currency that's recently around narcotics versus currency that's within the circulation. In our case, if you look at the declaration submitted by Officer Harding, who was the trainer of Jasper the dog. First, Jasper, he first started with Jasper in January of 2011. Jasper graduated in February 2011, and then this incident happened in March. I'll be very fair with the counsel. Sure. It seems to me you're making a great jury argument that I'd make if I were in your shoes. But we're past that. We now have a judge who's looked at all these factors, got some on one side, some on another. He's determined what he should do. And even giving you full credit for everything you got to say, which I'm not sure we need to, I still am of the point where I have to say that all of these four facts are so out of it that he's clearly erroneous. Clearly. I believe it's clear because I don't believe, I think, number one, he did not find it was a sophisticated dog search. So. Well, he mentioned. He mentioned there was a dog search. He didn't say it was sophisticated. He didn't say it was sophisticated? No. The district court never found and never stated it was sophisticated dog search. There's a difference. What was the evidence surrounding Jasper the dog? Well, the evidence, as I was saying, with Jasper is Jasper, first of all, as far as the training goes, was trained and only graduated in February of 2011. So he had been in service approximately no more than 50 or 60 days. The declaration by Officer Harding talks about the training given regarding currency, and his declaration dated September 2012 talks about during the time I've had Jasper. So it would appear the training regarding currency was sometime after this incident occurred. So I read the declaration as the training is he can alert to narcotics, but not specifically to the currency. And at the time of the incident had he been trained that it was recently near narcotics. Now, again, we're talking about a case where we don't even know what drug the government is alleging that Mr. Sear was involved in and what this deal was. I mean, they're talking about a note that has the number 135 and a note that has an area code for 760. And out of that, they create a drug deal that this Mr. Sear drives out and he's $3,000 short. Well, it wasn't just out of that, though. I mean, there's some other interesting aspects to his statement of how he came across the cash and what he was doing. I mean, he was driving on, I mean, which the district court judge can all take into account. I mean, he was either on his way to a casino or coming back from a casino, but he didn't know the name of the casino. He actually didn't go into the casino. He drove all this way, and then he was going to invest in an RV business. He's a massage therapist from Quebec, Canada, I believe. And this was his father's money, and he was driving around California with it in his back seat. I mean, and then the dog detection. So it wasn't – I know that we have some other factors aside from the dog detection. And so I think it is an interesting question. Can we say that the district court judge was clearly erroneous in his finding? Well, one, I would say, yes, again, and I would submit to this Court that the source was not disputed. He told them he inherited it. He produced evidence of his father's death. We produced evidence that he reported it to the taxing authorities in Canada. Well, that piece of evidence, was that the one that he produced himself, the finding of the $138,000? Was that an official document? Yes, it was an official document filed with the Canadian government. It was never disputed by the government here. And so the source of the money is not even disputed here. So now, you know, we're looking at this theory that it may have been used for something. As far as he was nervous, he did not know – he was not familiar with California. He was not feeling well due to his diabetes. I mean, it's not – there's certainly the cases we cited in our briefs. Nervousness is not enough alone, and he certainly provided plenty of explanation about his RV business. Did you identify that the burden is on him? And I'm curious, did he provide affidavits from the TIPRI and Nostradamus and TIPRI's contact in California corroborating his story that – about what his circumstances were? He did not, but the people he was e-mailing with, but he did provide some declarations from people. How about any affidavits regarding the source of the cash? Yes, there was an affidavit from a family friend that was provided that they were aware that when he died that his father worked and had saved the money. But as far as the source itself, it was never countered. And, again, the government had an opportunity in discovery to ask. They had an opportunity to investigate. They failed to do that, and now they're just coming in and saying, hey, we don't believe it. I would ask to reserve my final two minutes. Let me ask you, why did he stipulate to the forfeitability? Because he – I believe, again, that would be a mitigating factor. He accepted responsibility. He admitted that he brought it in, and based upon that he brought it in illegally, it's subject to forfeiture. And really the main issue then is what's the appropriate fine for bringing it in illegally? Because he said that at the very beginning, and he was honest about it, and that's the reason I think that the Court should consider in determining whether there should be mitigation. And I would – If I have these four factors in front of me, does your client have the job of overcoming the burden on all four? I believe it's a totality of the circumstances. So if he loses on one but wins on three, the government would still be okay? No. No. I think if Mr. Sear – I mean, we've got four factors to look at. Absolutely. There's four factors. Nature and extent, the violation of other activities, the penalties imposed by the violation, other penalties, and the extent of the harm. What if he wins on one and loses on three? If Mr. Sear – I think Mr. Sear wins on three that we can almost agree upon. Number one, that it's not serious, there is no criminal charge. I understand what you're arguing, but you're not answering my question. Has he got to win on all four in order to get out of this forfeiture? No. Okay. How many has he got to win on? It's a totality. So it depends how much – if you say win and lose, you take them all together, and I don't believe it's a win and lose per anyone. All right. I would submit and reserve the remainder of my time. I just wondered. I can approach that. Okay. Good morning, Your Honors. Assistant United States Attorney Stephen R. Welk for the government. May it please the Court. The district court decision should be affirmed here because what the district court did was follow what the statute, what the Supreme Court, and what this Court has told it to do. I'd like to begin with the statute because that's really important here. The main statute here, of course, the claimant stipulated to the forfeitability of this property for two bases. One was the failure to declare under 53-16, 53-17. The other one, the more important one, I would suggest, is the bulk cash smuggling violation under 53-32. That statute uses the word smuggling, and Congress used the word smuggling in that statute with a specific purpose, and that is very clear. It was discussed in the brief and in the cases that have looked at this about why they used the word smuggling because there's a tradition, a tradition from the first Congress of the United States, where the first Congress passed statutes that allowed for forfeiture of ships and cargo involved in customs violations and smuggling. Smuggled property traditionally over the course of the history of this country has been subject to forfeiture, has been forfeited. It's subject to very few limitations. In 2000, when Congress passed the Civil Asset Forfeiture Reform Act of 2000, Title 19 smuggling violations were excluded from the provisions of that statute, meaning that those customs smuggling type cases still proceed even today under the old system for the pre-2000. And does it matter to our analysis that Mr. Sear was not convicted of any of those crimes that are listed as the ones he stipulated to? Does it matter? It doesn't matter, and as Congress noted in its findings and the reasons when it explained why it enacted 53-32, it explained that, particularly with respect to bulk cash smuggling. It matters when we're talking about mitigation, doesn't it? Well, no, it doesn't. The reason it doesn't matter is because the fact whether he was charged or not is irrelevant to the issue of whether the fine is excessive. The reason is, as Congress explained, the people who move the cash in these situations, and the bulk cash smuggling statute assumes, it presumes, that the money that is being smuggled is involved in some other type of illegal activity, and that's why it's being smuggled. Are you asking, are you really telling me that if we had this case when Baja Kadhijan was the only precedent that the defendant would win? No. I'm telling you, no, because of the ñ Because it seems to me Baja Kadhijan is right on point, and he would win. I respectfully disagree with Your Honor, and I'll tell you why. Because I saw what he's agreed to. It seems to me it was an easy agreement to a forfeiture under that statute because Baja Kadhijan, that's the Idaho way to say it, I don't know, would have probably helped him out. But when we got 5332, which is what you're arguing, it's a different circumstance. And so, but he didn't admit to that one, right? He didn't admit to forfeiture under that statute. He admitted to forfeiture under both. He admitted, he stipulated to the forfeitability of the money under all of the allegations. Under both? Under both. Under the 5332 as well? Yes. Okay. I missed that. The stipulation that was filed with the Court admitted that the property was forfeitable for all of the reasons alleged in the complaint. So both bases were alleged. That being said, there is still a difference between, even if he had only admitted to the failure to declare statute, in Baja Kadhijan, and fortunately or not, I've been around long enough to have worked on that case, the Baja Kadhijan case. That case... I'm the only one that remembers that. The government did not dispute in the Baja Kadhijan case that that money was derived from a legitimate source and there was no, the government did not argue that it was intended for an illegal purpose. That's important. It's critically important because that changes the whole analysis. And what's most important here is this finding that the district court made that this money was probably involved with drug trafficking. Let me ask you about that finding now. You know, it's not a finding that it was. All Judge Rills said was, if you call it a finding, that it probably was. What does that mean? Well... Does that mean we test under clear error what the probability was or what? No, I don't think so, Your Honor. I think... Well, the statute doesn't say, you know, or the cases don't say, one of the factors is whether it's probably related to illegal activity, right? That's true. What does this finding mean? I think what it means is that Judge Rills found it was more likely than not that this money was involved in drug trafficking or was intended to be. It's more like a probable cause finding, you know, which is not a finding at all. I suppose one of the problems with this excessiveness issue, and it's sort of in a macro sense, is the lack of specificity in the authority interpreting it. And I understand that's one of the points to be made here. I guess what I would suggest, though, is I'm not sure the Supreme Court or this Court, when it's talked about determining whether the property is involved in some other type of illegal activity, has ever had the occasion to decide what standard of proof applies. And I think the reason that no one has ever considered what standard of proof applies is because it's not the government. The government doesn't have a burden in the excessiveness analysis. The burden is for the claimant to prove that the property is not involved in any other illegal activity. The government here presented substantial and compelling evidence that it was involved in drug activity. And I would point, in addition to the... What about Mr. Kaplan's argument about, well, I was never finding that the dog search was by a sophisticated dog. You know, the dog search, part of the problem with the way, procedurally, with the way this case presented, first of all, I would point out that in looking at the, and I'm looking at the government's excerpt of record at page 95, that's where the declaration is from the dog handler. The dog handler explains what the qualifications are for he and the dog, that he's certified by the California Narcotics Canine Association and he was certified in 2012. It is absolutely true that there is no, there's nothing in this declaration that says my dog is a sophisticated dog. But the reason for that is this idea of a sophisticated dog is not something that dog handlers use. That's not a term that they use. What do you mean? The case law doesn't mean anything? No, no, not that the case law doesn't mean anything, but I think what the court meant, what this court meant when it talked about a sophisticated dog, was the fact that the dog in that case, as the dogs in all of these cases, is trained to detect the ephemeral byproducts of drugs, not the residue of drugs. They're not actually alerting to the, I don't mean to get too much into the science of this, because it's not really part of the record. My question is, is it a science at all? Well, and I would suggest to the court that it's not. There is some science to it. The science that's been accepted by this court is this study that was done several, more than ten years ago now that talked about what the dogs are alerting to, and it was these ephemeral byproducts. It's similar to the experience that one has when one gets into an elevator and can smell french fries, but there's nobody else in the elevator, and that leads the person to conclude that someone was in the elevator with french fries. There's something about the drugs, the money will absorb the scent. And again, I don't want to get too deeply into that, because I guess in this case the dog hit just isn't that critical. Well, let's take out the dog sniff. Okay. Argue your case. What are you left with? Is it enough? Well, first of all, his story is basically implausible for a lot of reasons that are just practically implausible. He says he found $140,000 in his father's house after his father died. His father was a Canadian government building inspector who somehow managed to accumulate, according to his story, $140,000 in foreign currency. He finds that money in a safe in his father's house, and then nine months later after he's found it, he brings it with him on vacation to California, $140,000 in cash, carries it with him everywhere he goes because he's afraid he's going to lose it, but he leaves $800 worth of currency in his hotel room when he's gone. But I think the most compelling evidence here is these text messages on his phone. Those text messages, if you read them, all of them are in French. Nobody's using their names. They all use these code names, which is typical of a drug transaction. They're all talking about him meeting with someone, and there's specific references in those messages to whether he has the money or not. Everything about those messages suggests that he's going there to engage in a drug transaction. He's got that handwritten piece of paper with the phone numbers on it, also written on that piece of paper is the number 135, which very strongly suggests that he was going to engage in a drug transaction for which he owed $135,000, but he didn't have $135,000. He only had $132,000. And in the messages that are exchanged about an hour before he's stopped and the money is seized, there are messages exchanged between these people, T. Perret and Nostradamus and these others, Makita saying, we're going to put this off until tomorrow. We're going to do it tomorrow morning. And one of them says, one of the guys says, T. Perret, I believe, sends a message to one of the others saying, are you taking the money? So there's specific references in these messages to the money. It's clear that he was going out to the desert to meet with someone to exchange something for money, and all of the indications are that that was for drugs. There's no indication that anything he said in his declaration is necessarily true. The idea that just because the government can't disprove that he found $140,000 in foreign currency in his father's house, that we can't disprove that, that that means we concede it or that we agree with it, is absurd. But going back to the statute again, the idea behind the bulkhouse smuggling statute, according to the congressional findings, is there is a presumption that people who are moving money in this fashion are moving it because they're trying to disguise where it came from or what it's going to be used for. In Bajikasian, there was no dispute that the money was clean or that the money was going to be used for a legal purpose. In $100,348, there was no dispute about what the source of the money was. Now, there was some dispute in that case about what the money was going to be used for because in that case, the claimant, Maisel, had heat sealers and plastic bags in his bag that the government argued was indicative of drug trafficking. But what's important is the district court disbelieved that. The district court rejected the government's argument and said, no, I don't think it is going to be used for drug trafficking. I think this is legitimate money. The opposite is true here. I think based on the statute, based on the guidance that this Court has given and the guidance that the Supreme Court has given, the district court was absolutely correct, and under the standards that apply here, the decision should be affirmed. Thank you. Thank you. You're over your time, but I'll give you 30 seconds. Thank you, Your Honor. Just addressing the 5332 argument, nowhere in that statute does it say smuggling. It talks about concealment. And really the focus this Court should have, and I believe in excessiveness, is look at the conduct. He brought it in. He didn't report it. I mean, if it's concealed, it could be in a bag. It could be in a pocket. That's really the issue here. And the overall picture is it was not rebutted, the source of the funds, and it's an excessive fine. The drug link has never been shown. It's mere suspicion. That's all it is. And I think this Court should mitigate it, consistent with our briefs, and I would submit it. Thank you. Thank you. All right. Case 12-56988, United States of America v. The Currency, is submitted.
judges: Tashima, Smith, Murguia